IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,    :

v.        :  CRIMINAL CASE NO.:

DARIUS CALDWELL    :  1:16-CR-00355-MHC-JSA

## REPORT AND RECOMMENDATION

Defendant is facing charges for a bank robbery he allegedly committed in Smyrna, Georgia on September 7, 2016.  Defendant was found hiding in a residential neighborhood near the bank a few minutes after the robbery occurred and he was arrested shortly thereafter.  The matter is before the Court on three motions to suppress filed by Defendant: (a) a Motion to Suppress Evidence obtained as a result of the arrest [20], alleging that the police lacked probable cause to detain and arrest him, (b) a Motion to Suppress Identification Testimony [34], alleging that the police obtained an identification from a victim bank teller, and (c) a Motion to Suppress Statements [19], which alleges that the agents continued to question and otherwise talk to Defendant about the case after he unequivocally invoked his *Miranda* rights to a lawyer.

As explained below, the Motions to Suppress Evidence and Identification are clearly meritless.  The Motion to Suppress Statements is the closest call,

because the agents engaged in conduct that the Eleventh Circuit has found to constitute "interrogation" based on analogous facts, after Defendant invoked his *Miranda* rights.  However, the undersigned ultimately concludes that the Defendant did not respond to this interrogation.  Rather, he voluntarily and spontaneously uttered his incriminating statements at a later time after a sufficient break in the stream of events.  Thus, all three motions to suppress [19][20][34] should be **DENIED**.

## FACTS

### A.    The Robbery

Around 10:00 am on September 7, 2016, an employee of a local business in Smyrna, Georgia called the police to report a suspicious looking man hiding in the bushes outside a bank, with a bandana on his face, a bag in his hand, wearing blue jeans, a black t-shirt, and black shoes.  The man was described as African-American and wearing dreadlocks.  *See* Gov't Ex. 8 (CAD Audio file contained within Record Supplement Disc[1]).

Shortly thereafter, a man generally matching the same description robbed a teller at gunpoint at the Bank America branch on South Cobb Drive in Smyrna,

---

[1] Upon agreement, the parties jointly submitted the Record Supplement Disc after the hearing, which includes certain body camera footage and audio files. Although this disc was not marked with any exhibit sticker, the Court will treat this disc for purposes of the record as Government Ex. 8.

Georgia.  *See* Tr. at 11-12, 29-30[2].  The teller later described the robber as an African-American male, approximately five feet, nine inches tall with a slight to medium build, wearing a blue bandana over his face and something on his head, while carrying a black bag and a handgun.  *See* Tr. at 193, 204-205, 213-214.

Officer Carper arrived on the scene within just a few minutes, and was informed by witnesses in the bank parking lot that the Defendant ran to the southeast, between a State Farm office building and a BB&T bank.  *See* Tr. at 12-13, 31-32; *see also* Gov't Ex. 7 (map of the area).  Officer Carper drove in that general direction and, while on nearby Lois Street, was informed by construction workers that they had just seen a black male running in the area.  Tr. at 13, 32-34. Officer Carper continued generally in the same direction, making some twists and turns in the residential neighborhood, and eventually turned onto Glen Pointe Way. Tr. at 14-15, Gov't Ex. 7.  Glen Pointe Way is a cul-de-sac one street over from Lois Street, where the suspect had last been seen running.  *Id.*   When Officer Carper reached the end of the cul-de-sac, he spoke to two residents.  *Id.* at 15-16, 34-36.  They advised that they had not seen anyone, and at Officer Carper's suggestion they went inside their house for safety.  *Id.* at 16-17, 36.  Officer Carper

---

[2] Because of witness unavailability and other issues, the hearing was continued over three separate dates.  Thus, the transcript is in three parts [39][40][44].  The pagination of this transcript nevertheless is consecutively numbered, and therefore it can be cited to as a single continuous transcript.

continued driving around the neighborhood, and eventually returned to the Glen Pointe Way cul-de-sac. *Id.* at 17. Shortly thereafter, one of the residents with whom Officer Carper had previously conversed came out of their house to advise Officer Carper that a suspicious person was hiding in their backyard. *Id.* at 17-18, 20, 36.

Officer Carper walked to the backyard and found the Defendant crouching and hiding behind the house. Tr. at 18. Officer Carper instructed the Defendant, at gunpoint, to lie on the ground, while other officers placed him into handcuffs. *Id.* at 18, 21, 41-42, 59, 62, 64, 128, 130. The Defendant was brought into custody at this point within approximately one quarter of a mile from the bank, and roughly ten minutes after the robbery. *Id.* at 20-21, 60, 130-133.

### B.      The Investigative Detention

At first, the Defendant was subject to an investigative detention, as the officers attempted to gather more facts as to whether the Defendant was the same individual that robbed the bank.   Among other considerations, the Defendant did not have dreadlocks, whereas the robber was identified as having dreadlocks. Tr. at 68, 132. As to his height, the defendant roughly met the description. Officer Carper stated that the Defendant was roughly five foot ten inches or six foot, whereas another agent on the scene estimated his height at five foot eight or nine inches. Tr. at 38, 194. The officers also began looking for the bag that contained

the GPS tracking device that the victim teller had placed in the bag during the robbery.  Tr. at 23-24, 66-67, 82-83, 133 148.  The bag was located roughly ten minutes later, in bushes approximately five feet from where Officer Carper found the Defendant hiding.  *Id*.  When the officers opened the bag they discovered the GPS tracker, the stolen money, a wig with dreadlocks, a blue bandana, and a firearm that matched the general description of the one used by the robber.  Tr. at 24-25, 68, 134, 148.

At about 10:45 am, Sergeant Forman obtained copies of two screen capture pictures from the bank surveillance system depicting the robber.  Tr. at 71-72; Gov't Exs. 4, 5.  One of these pictures showed that the robber was wearing the same inside-out Pittsburgh Steelers shirt that Defendant was wearing.  Gov't Exs. 4, 6.  As a result of these photographs, the discovery of the robbery bag (including the dreadlock wigs) within a few feet of where the Defendant had been hiding, and other information, Sergeant Forman concluded that Defendant was the same person as the robber.  *See* Tr. at 72-74.  At around this same time, Officer Carper also ran Defendant's criminal history and discovered that Defendant was a previously-convicted felon.  *Id.* at 25-26.  Officer Carper at one point also stated to another officer "why would he give up if it wasn't him?"  Tr. at 48.  Officer Carper insisted that this feeling was not a basis for detaining or arresting Defendant.  *Id.* at 48-49.

Other information remained less conclusive.  A witness sent a cell phone

photograph of the suspect that was crouching in the woods outside of the bank immediately prior to the robbery. Tr. at 69 and Gov't Ex. 3. Although the individual appears to have similarly colored clothes and a bandana mask, Sergeant Forman believed that she saw a rip in the pants depicted in the photograph. *See* Tr. at 70-71; Gov't Ex. 3. Indeed, while the photograph (Gov't Ex. 3) is very difficult to discern, there is black mark on the inner portion of the left pant leg right above the shoe line, that appears as if it could be a rip or stain. Nevertheless, Sergeant Forman found no such rip in Defendant's jeans. Tr. at 43-48, 54, 70-71).[3] Thus, at least one officer during the investigative detention of Defendant stated "the pants don't match." Tr. at 43. According to Sergeant Forman, she did not know whether the mark was a tear or not, and the lack of a tear on Defendant's pant leg did not suggest to her that he was uninvolved in the robbery. Tr. at 71. The ambiguity as to whether the Defendant was the same individual who was hiding in the bushes before the robbery simply added to the officers' concern as to whether there might have been an accomplice still at large. *Id*.

The Defendant introduced into evidence exhibits 2.A-2.D, which are photographs depicting extensive tattoo-work on Defendant's arms. Although the

---

[3] Defendant cites Officer Carper's testimony as stating that the witness had observed a rip in the jeans. *See* [50] at 2, citing Tr. at 42-44. What Officer Carper actually said, however, was that he recalls some information being discussed about a rip in the pants, but he did not recall the source of that information. *See* Tr. at 42-44.

bank surveillance photographs reveal that the robber wore the same very distinctive shirt that Defendant was wearing, as well as a bandana and wig similar to that found in the bag located five feet from the Defendant, the photographs do not appear to reveal any tattoos on at least the portions of the robber's arm that are visible.  *See* Gov't Ex. 4.

### C.    The Show-Up

At around 10:30, Detective Turner arrived at the bank.  Tr. at 142, 206.  He spoke to the teller and, after having been informed that the officers had apprehended a suspect nearby, asked the teller whether she might be able to identify the robber.  *See* Tr. at 142, 159-160, 206, 227.  The Detective did not suggest that the Defendant was the robber.  *Id.*  The teller indicated that she might be able to positively identify the robber, and so just a few minutes after arriving at the bank Detective Turner drove the teller out to the location where Defendant was detained.  *See* Tr. at 142-143, 160, 207.

On the way, the teller began to express uncertainty as to whether she really would be able to identify the robber, particularly because he had been wearing a bandana mask.  *Id*. at 143, 164-165.  Detective Turner told her "well what I try to do to remember an occurrence, I think of the thing I was doing just prior to the occurrence, and she said okay, and that's about it."  Tr. at 143.  The witness, who also testified, indicated that when she told Detective Turner that she did not know

what she would be able to tell them, he assured her, "that was fine that they didn't expect me to do anything other than that, you know, other than what I could." Tr. at 207.

Detective Turner drove up to the scene where Defendant was detained in the back of a squad car. Tr. at 143-44, 207-208. Defendant was removed from the squad car and presented, with his hands cuffed behind his back, to the teller, who was sitting in the back of Detective Turner's separate squad car. Tr. at 143-145, 165-166, 208-209. The witness immediately stated, "yes, that's him." Tr. at 145, 162. When asked to explain the basis of her identification, the witness stated that the Defendant had the right height, build, and skin tone, and wore the exact same very distinctive shirt. Tr. at 145, 152-153, 163, 209, 228. Detective Turner relayed the positive identification to Sergeant Forman and the other officers. Tr. at 145-147.

### D.   Defendant's Statements

Around approximately 11:20 am, Officer Carper transported Defendant, who by then was considered to be under arrest, to the City of Smyrna jail and police department. Tr. at 26, 57, 74. The Defendant was turned over to the FBI at around noon. Tr. at 87-88, 103. The Defendant was not questioned, and made no incriminating statements, during his time at the Smyrna jail/police station. Tr. at 26-27, 74-75, 88. Rather, prior to any questioning, the Defendant stated to Smyrna

detectives that he did not wish to speak and that he wanted a lawyer.  Tr. at 89-90, 97-99.  Defendant's invocation of his right to a lawyer and to remain silent was relayed to the FBI.  *Id.*

At around 1:40 p.m., a FBI Special Agent transported Defendant from Smyrna to the Atlanta Police Department for processing on these federal charges. Tr. at 91-92.  During the thirty minute drive, the agent asked Defendant personal, family-related questions, including asking Defendant "how he was doing," "if he had a family, you know, if he worked," which the agent described as "small talk," and "rapport building."  Tr. at 92.  The agent then also "explained the process to him," that is, that "we would be taking him to the Atlanta Police Department to book him.  We would then take him to the Atlanta City Detention Center where he would be housed.  The following morning we would pick him up and bring him to the Marshals, and he would go before a judge for his initial appearance."  *Id.* Defendant did not make any inculpatory statements during the thirty minute drive to APD.  *Id.* at 92-93.

After arriving at APD, the agents booked the Defendant and only asked him standard booking questions, such as "name, date of birth, social security number, address, emergency contacts," etc.  Tr. at 104-105.  During the booking process, Defendant made certain extraneous, inculpatory statements.  First, he said "I don't see what the big deal is, they got the money back and no one got hurt; and he also

said it wasn't worth 3,000 dollars." Tr. at 93-94. After booking, the agents took the Defendant back down to their vehicle. He was restrained in handcuffs and leg shackles and stated "I'm going to be like this for ten years." *Id.*

## DISCUSSION

### A.   *Motion To Suppress Evidence On Grounds Of Alleged Illegal Seizure*

Defendant has filed a Motion to Suppress Evidence [20] resulting from his allegedly illegal arrest. It is not clear whether evidence was actually obtained as a result of the arrest other than Defendant's statements, which are the subject of a separate motion to suppress [19].[4] In any event, because it is clear that the police possessed probable cause to arrest Defendant, the Motion to Suppress Evidence [20] should be denied.

A warrantless arrest is constitutionally valid only when there is probable cause to arrest. *See United States v. Watson*, 423 U.S. 411, 417 (1976); *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982). Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed

---

[4] Defendant does not appear to argue that the bag that contained the proceeds of the robbery and other evidence, which was found nearby where the Defendant was hiding but was not seized from him specifically, is subject to suppression.

or was committing an offense." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). In determining whether probable cause exists, the Court "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 229-31 (1983) (*quoting Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

An officer is not required to resolve all inferences and all factual conflicts in favor of the suspect. An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect. *Bailey v. Board of County Com'rs of Alachua County, Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); *United States v. Pantoja-Soto*, 739 F.2d 1520 (11th Cir. 1984). Officers may rely on information received from an "identified bystander or victim-eyewitness to a crime." *United States v. Martin*, 615 F.2d 318, 325 n.9 (5th Cir. 1980) (*quoting United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972)). Such persons are deemed generally reliable because they "are not 'intimately involved with the persons informed upon and with the

illegal conduct at hand' as other informants often are." *Id.*

Here, just a few minutes after the robbery, the officers located the Defendant hiding in a residential neighborhood approximately 1/4 mile away. Within a few more minutes, the officers located the robbery bag, apparently tossed into the bushes, approximately five feet from where the Defendant had been hiding. This bag contained the GPS tracker from the bank, the currency that had been stolen, a gun matching the description of the one used in the robbery, a bandana in the shape of a mask consistent with the one worn during the robbery, and a wig with dreadlocks also apparently consistent with the dreadlocks worn by the robber. As if this were not enough, within approximately 30 minutes of having apprehended the Defendant the officers also received screen capture shots of the robber, which showed that the robber wore the same exact very distinctive shirt as the Defendant–a Pittsburgh Steelers shirt worn backwards and inside out, just as the Defendant was wearing. And, at around this same juncture, the victim teller herself specifically identified the Defendant in a show-up by stating "yes, that's him." These facts overwhelmingly established probable cause to arrest.

Defendant points to the ambiguities or questions that the officers attempted to resolve during this dynamic, fast-moving investigation. For example, Defendant points to the photograph (Gov't Ex. 3) that shows what might be a rip or stain on the pants of the individual that appeared to be about to rob the bank, and the

officers' conclusion that Defendant's pants did not show such a rip.   Indeed, apparently based on this photo, at least one officer stated during the hubbub of the scene that "the pants don't match."  Tr. at 43.  Defendant also points out this arms have prominent tattoos at least on portions of at least one arm.  By contrast, the screen shots of the robber in the bank do not appear to reveal tattoos, and the victim teller did not mention tattoos in her description of the robber.

Probable cause, however, does not require certainty, or even proof beyond a reasonable doubt.  Thus, that the roadside investigation did not answer every possible question in the case and conclusively resolve every ambiguity in the evidence does not negate probable cause to arrest.  Whatever the small, dark and blurry mark that appeared to be on the jeans depicted in Gov't Ex. 3 may have been, this photograph does not itself eliminate or mitigate all of the other much more significant evidence that the police uncovered.  Of far more significance was that the Defendant was wearing what was obviously the same shirt as the robber, and was found hiding immediately next to the robbery bag itself.

As for the tattoos, it will be for a factfinder to compare the photographs and other evidence of the Defendant's tattoos to the screen shots of the robber.  Perhaps the jury would conclude that these photographs are not of the same person as a result of these tattoos.  But the screen shots do not depict the entirety of Defendant's arms, and the Court cannot say with precision from Defendant's

exhibits what exact portion of which arm(s) are covered.  Nor can the Court say, or find that the arresting officers should have assumed, that these surveillance still shots were of sufficient resolution, quality and lighting to expect to reveal the tattoos.  And while perhaps the teller's failure to mention tattoos may be a factor that the jury may weigh in considering the teller's reliability, it hardly means that the police lacked probable cause.  Again, the Court cannot say based on the photographic evidence presented that the portion(s) of Defendant's arm(s) that contain tattoos would have been visible to the teller from her advantage point, and/or that the Defendant's arms would have been the focus of her attention during this encounter.[5]

---

[5] Defendant also cites Officer Carper's comment on the scene to the effect that "why would he give up if it wasn't him?"  Tr. at 48.  Defendant argues that it is impermissible to consider a suspect's lack of resistance as evidence of guilt.  Not every comment by every street officer on the scene during a large and fast-moving investigation can be invested with great probative value, however.  While Officer Carper was the initial officer on the scene, there was no suggestion that he was in charge of the ultimate investigation, which quickly involved Sergeants and Detectives and several other officers.  And there is no evidence that the investigators as a whole considered Defendant's lack of resistance as a factor.  In any event, the question of probable cause is judged on an objective standard based on the collective knowledge of the relevant investigators, not based on the actual subjective mindset of any individual officer.  *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992) ("Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause.")  Viewing the evidence known to the police, there was more than enough basis for a reasonable officer to find the existence of probable cause.

In the end, the officers possessed strong evidence linking Defendant to the robbery, and the fact that Defendant may still possess some evidentiary arguments in his favor at trial does not mean that the officers lacked probable cause. They did, and Defendant's motion therefore should be denied.[6]

## B.   *Motion To Suppress Identification*

In *Simmons v. United States*, 390 U.S. 377, 384 (1968), the Supreme Court explained that to challenge the constitutionality of identification procedures successfully, the defendant must show them to be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." This standard is applied in a two-part test: (1) whether the identification procedures were unduly suggestive, and, if so, (2) whether, under the totality of the circumstances, the identification was reliable. *See Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991); *see also Neil v. Biggers*, 409 U.S. 188, 198-200 (1972). This test applies equally to in-court and out-of-court identifications. *Jones v. Kemp*, 794 F.2d 1536, 1539 (11th Cir. 1986).

---

[6] Even if probable cause did not exist immediately, the officers obtained probable cause relatively quickly, within 30-45 minutes, after locating and searching the robbery bag, receiving the screen capture shots, and at most after obtaining a positive identification from the victim. During this time, the officers possessed more than enough reasonable suspicion to continue holding Defendant while they continued to quickly investigate. *See United States v. Hardy*, 855 F.2d 753 (11th Cir. 1988) (affirming the legality of an investigative "*Terry*" stop that lasted 50 minutes).

If the identification process is determined not to be unduly suggestive, there

is no need to proceed to the second part of the analysis and the inquiry ends.

*Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988).  If, on the other hand, the

process is determined to be unduly suggestive, a court must look at the totality of

circumstances surrounding the identification, including:  the opportunity of the

witness to view the perpetrator at the time of the crime, the witness's degree of

attention, the accuracy of a prior description, the level of certainty of the witness,

and the length of time elapsing between the crime and the identification.  *Biggers*,

409 U.S. at 199; *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Blanco*,

943 F.2d at 508; *United States v. Cannington*, 729 F.2d 702, 711 (11th Cir. 1984).

These factors must be weighed against the corrupting  effect of the suggestive

identification itself.  *Manson*, 432 U.S. at 114.

On the one hand, single-person show-ups, such as utilized in this case, are

"widely condemned."  *Johnson v. Dugger*, 817 F. 2d 726, 729 (11th Cir. 1987)

*(citing Frank v. Blackburn*, 605 F. 2d 910, 912 (5th Cir. 1979)).  On the other

hand, when done immediately at the scene of a crime, such a procedure may

uniquely "allow identification before the suspect has altered his appearance and

while the witness' memory is fresh and permit the quick release of innocent

persons." *Id.*[7]  Thus, the Eleventh Circuit has made clear that "show-ups are not

unnecessarily suggestive unless the police aggravate the suggestiveness of the

confrontation." *Id.*

Applying these considerations, the show-up in this case was not unduly

suggestive.  The police immediately arranged for the teller to look at the detained

suspect just over approximately thirty minutes after the robbery itself.  While this

was a single-suspect show-up, that procedure was necessitated by how quickly the

investigation had unfolded, by which Defendant was found and detained so quickly

after the robbery.  There was no evidence to suggest that the police could have

possibly arranged for a formal Usual Suspects-style lineup right there at the scene

within anything close to such a short amount of time.  It was a reasonable

investigative decision, and was not in itself unduly suggestive, to go ahead and

conduct the identification in these circumstances.  Any other rule would perversely

have the police decline a step aimed directly at increasing reliability and reducing

the time of investigative detentions.  Happily, *Johnson* makes clear that this is not

the law.

The question in these circumstances is therefore not simply whether the

---

[7] By contrast, courts often find the display of a single photograph to a witness several days after he or she witnessed a crime to be unnecessarily and unduly suggestive.  *See*, *e.g., Manson v. Brathwaite*, 432 U.S. 98 (1977).  Such a procedure has the inherent suggestiveness of a single-suspect identification but without the necessity and freshness of an immediate on-the-scene show up.

identification involved a single suspect.  The more important question is whether the police did anything otherwise to aggravate the suggestiveness of the identification.  They did not.  Detective Turner simply informed the teller that the police had detained a suspect nearby, not that this individual was actually believed to be the robber.  *See* Tr. at 142, 159-160, 206, 227.  When the witness expressed uncertainty as to whether she would be able to recognize the robber, Detective Turner simply told her "that was fine that they didn't expect me to do anything other than that, you know, other than what I could."  Tr. at 207.  Detective Turner also suggested, "well what I try to do to remember an occurrence, I think of the thing I was doing just prior to the occurrence, and she said okay, and that's about it."  Tr. at 143.  Although the Defendant was taken out of a squad car with his hands cuffed behind his back, this would have suggested only what Detective Turner initially stated, that is, that the police were detaining a suspect.  Thus, the police did not unduly suggest that the witness should positively identify Defendant, and the Motion to Suppress Identification Testimony should be denied.[8]

_____

[8] Even if the procedure could be said to have been unduly suggestive by virtue of there only being one suspect presented to the witness, the answer would not necessarily be suppression.  The inquiry, rather, would continue to the second prong of the test, to assess whether the facts otherwise established a sufficient basis for reliability.  The Court would find in the Government's favor on this prong as well, in the alternative.  The witness herself explained the basis of her identification, that is, that the Defendant had the right height, build, and skin tone, and wore the exact same very distinctive shirt.  Tr. at 145, 152-153, 163, 209, 228.  She fully acknowledged that she could not see most of the robber's face because of

**C.**   ***Motion To Suppress Statements***

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. The Supreme Court also made clear that the Government has the burden to show the knowing and intelligent nature of a waiver. *See Miranda*, 384 U.S. at 475. Indeed, the Supreme Court has stated that "[if] the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon  the government to demonstrate that the  defendant knowingly and intelligently waived his privilege against self-incrimination and  his right to retained or appointed counsel."  *Id.*

The Supreme Court instructs us to look for two things in assessing this question:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may

_____

the bandana, but she nevertheless expressed no hesitation in identifying him on the basis of the other characteristics that she observed.  The witness was obviously in close visual contact with the robber at least for the brief period of the encounter and, significantly increasing the reliability of the identification, she observed him again for purposes of the show-up just over thirty minutes afterwards.

a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation

omitted).

Here, it is undisputed that Defendant made incriminating statements while in

custody, without having waived his *Miranda* rights, and indeed after he had clearly

and unequivocally expressed his desire for a lawyer.  The Government's position,

however, is that Defendant spontaneously uttered these remarks, and that the

agents engaged in no interrogation.

Not all questions or statements by law enforcement to an arrestee constitute

*interrogation*.  "The term 'interrogation' under *Miranda* refers not only to express

questioning, but also to any words or actions on the part of the police (other than

those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response from the suspect."  *Rhode*

*Island v. Innis*, 446 U.S. 291, 301 (1980).   Defendant bears the burden of

establishing that he was subjected to interrogation in violation of *Miranda*.  *See*

*United States v. de la Fuente*, 548 F. 2d 528, 533 (11th Cir. 1977).

In most circumstances, simply informing a Defendant of the charges and

providing other basic information is not "interrogation."  *See Innis*, 446 U.S. at 301

(informing a suspect of the reasons for arrest is 'normally attendant to arrest and

custody' and is therefore excluded from the definition of 'interrogation.'); *See*

*Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir.1995) ("Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation."); *United States v. Payne*, 954 F.2d 199, 202 (4th Cir.1992) ("the *Innis* definition of interrogation is not so broad as to capture within *Miranda's* reach all declaratory statements made by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."); *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.1984) (merely explaining to a suspect why he is being arrested does not constitute interrogation).

However, the courts apply a strict, "rigid rule" after a suspect requests an attorney.  At that juncture, the Supreme Court has made clear that the communications should be limited to "a bare inquiry by either defendant or by a police officer which should not be held to initiate any conversation or dialogue." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983).  As the Eleventh Circuit has explained:

> The law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation. Any information or discussion regarding the case should be addressed to the accused's attorney. Only if the accused, after requesting counsel, voluntarily initiates further communication can the agents pursue more information and interrogation

*United States v. Gomez*, 927 F.2d 1530, 1539 (11th Cir. 1991) (internal citations

omitted).

The Eleventh Circuit in *United States v. Johnson*, 812 F.2d 1329 (11th Cir. 1986), addressed a series of statements virtually identical to what the agent said to Defendant in the car.  The Court in that case found a *Miranda* violation based not on any overt questioning, but rather simply on certain comments  by the police offered to "explain the process," consisting mostly of a brief and facially correct explanation of initial court appearance, bail determination and attorney appointment procedures.  *Id.* at 1330.  This discussion was not initiated by the Defendant, who had already clearly invoked his right to counsel.  In response to the officers' gratuitous comments about "the process," the Defendant made incriminating statements.  In the circumstances, the Eleventh Circuit rejected the Government's argument that the statements were spontaneously uttered, and rather found that they resulted from the police's "explanation," which the Court found to constitute impermissible interrogation.  In doing so, the Court appeared to apply a somewhat stricter bright line rule as to what constitutes "interrogation" in cases where *Miranda* rights have already been invoked.  As the Court explained:

> While stating to an accused in custody that the criminal justice system
> will be explained sounds innocent enough, those familiar with the
> criminal arena are well aware of the fact that such an "explanation" is
> often designed to inform the accused that cooperation may be beneficial
> when a judicial officer considers such matters as bail. This type of
> helpfulness is often used to indicate to the accused that the law
> enforcement officers will "be good if the accused will be good," or infer

"Why don't you be good and tell us about it?"

No interest would be served by attempting to list matters that may or may not be discussed by law enforcement officers with an accused in custody after the accused has indicated that a lawyer is desired before further interrogation. It best serves all interests, especially law enforcement, to remain close to the "bright line": interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation.

*Id.* at 1331.

The Government does not address or even cite *Johnson* in its responsive brief. But the statements of the agent transporting Defendant in this case cannot be distinguished from those that *Johnson* found to be unconstitutional. First, the agent engaged in "rapport building" questions about family. While not directly related to the case, this served very little apparent purpose other than to try to provoke some reaction or erode some psychological barrier. At a minimum, this was significantly risky. But more concerning–and largely identical to the questioning that formed the violation in *Johnson*–was the speech gratuitously offered to the Defendant about the upcoming "process."

Specifically, the agent "explained the process to him," that is, that "we would be taking him to the Atlanta Police Department to book him. We would then take him to the Atlanta City Detention Center where he would be housed. The following morning we would pick him up and bring him to the Marshals, and he would go before a judge for his initial appearance." Tr. at 92. This unsolicited

explanation of "the process" was essentially the same as the one found to constitute impermissible interrogation in *Johnson*.

Nevertheless, the existence of impermissible interrogation does not necessarily require suppression.  The question remains whether such interrogation actually resulted in any incriminating statements.  Importantly, a *Miranda* violation does not require suppression of all future statements made by a Defendant, if there is a "break in the stream of events ... sufficient to insulate" later statements from the earlier violation. *Clewis v. Texas*, 386 U.S. 707, 710 (1967). Relevant factors include "the time that passe[d] between confessions, the change in the place of interrogations, and the change in identity of the interrogators." *Oregon v. Elstad*, 470 U.S. 298, 310 (1986).[9]

In *Johnson*, a causal link was not disputed, as the Defendant made his

_____

[9] In an Order dated July 20, 2017 [54], the Court noted that the parties had not addressed the legal standards that apply to this question of causation, that is, assuming a *Miranda* violation in the car, whether Defendant's subsequent statements were attributable to that violation or, rather, whether the change in temporal and contextual circumstances in which those statements were made extinguished any causal connection that would otherwise warrant suppression.  The parties filed supplemental briefs [54][58] but still do not address this particular question at least in more than a conclusory, back-of-the-hand fashion.  Rather, the parties primarily continue to re-argue whether the agent's statements in the car constituted interrogation and thereby violated *Johnson*, etc.  The Court has disregarded the supplemental briefs to this extent, because this was not the subject of the Court's inquiry.  Thus, in the absence of guidance in the supplemental briefs as to the legal standards governing causation, the Court has largely relied on its own research on this question.

admissions directly in response to the agent's interrogation.  Here, by contrast, there is no evidence that the Defendant spoke in response to the "rapport building" questions or the agent's speech about "the process."  In these circumstances, the Court does not find that Defendant's incriminating statements resulted from the interrogation.  The Defendant made his statements after the thirty minute car ride from Smyrna, and in an entirely new procedural context (booking).  The booking process is significantly more formal and likely more intimidating and coercive than a car ride.  If nothing else, the booking process actually calls upon a  Defendant to speak and answer questions, as well as to submit to being photographed, fingerprinted, etc.  The booking procedure also occurred in a new and, likely, more menacing location than the back seat of a car, that is, the Atlanta Police station. The passage of time and, more importantly, the significant change in procedural context and location, combined to constitute a sufficient "break in the stream of events" to insulate the Defendant's incriminating statements from the agent's earlier interrogation.

It is much more likely that Defendant's spontaneous "I don't know what the big deal is" statement, and subsequent statements, were reactions to what he was being subjected to at that moment, that is, formal biographical questioning by booking officers (and perhaps fingerprinting, photographing, and other procedures attendant to the booking process).  Notably, notwithstanding the "bright-line" test

applied by *Johnson* for limiting interrogation after a suspect's invocation of *Miranda* rights, the Court has found no authority applying this rule to standard booking questions.  Indeed, it is well settled that such administrative questions are not interrogation and are permissible regardless of *Miranda*.  *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) ("Routine booking questions regarding the age, height, weight, eye color, name, and current address are 'reasonably related to the police's administrative concerns' and therefore exempt from Miranda's reach.) Indeed, standard booking processes do not implicate the concerns of *Johnson*, because such merely questions are not "designed to inform the accused that cooperation may be beneficial when a judicial officer considers such matters as bail." *Johnson*, 812 F.2d at 1331.

Certainly, the matter is complicated by the apparent similarity to the statements deemed to be improper under *Johnson*, and therefore the unavoidable conclusion that a *Miranda* violation occurred.  However, the Court ultimately finds suppression to be unwarranted, because the facts show that Defendant's statements were made after a sufficient break in the chain of events such as to vitiate any causal link with that *Miranda* violation.

## CONCLUSION

Therefore, Defendant's Motions To Suppress [19][20][34] should be **DENIED**.  This matter is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 23rd day of August, 2017.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE